J-S08039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.Z.E.G., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.B., MOTHER | : : : : : : | |
| | : | No. 1018 MDA 2021 |

Appeal from the Decree Entered June 25, 2021
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s): 41-AD-2021

BEFORE: BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.: **FILED JUNE 14, 2022**

M.B. (Mother) appeals from the orphans' court's decree involuntarily terminating her parental rights to her child, L.Z.E.G. (Child), born in August 2010, pursuant to the Adoption Act, 23 Pa.C.S. § 2511.[1] We affirm.

The orphans' court summarized the relevant history underlying the present appeal in its opinion. **See** Orphans' Ct. Op. at 1-18. The Dauphin County Social Services for Children and Youth (the Agency) initially became involved with Mother and her family in November of 2014, when it received "numerous referrals regarding allegedly inappropriate discipline by Mother of her children, including of D.M., who is [Child]'s older half-brother and who has

---

[1] The parental rights of the Child's father, M.E.G. ("Father"), also were terminated. Father is not a party to this appeal, nor has Father filed his own appeal. **See** Orphans' Ct. Op., 9/17/21, at 1.

Down's Syndrome." *Id.* at 2. In May 2018, the Agency determined substantial evidence existed to indicate Mother as a perpetrator of physical abuse against D.M. and one month later, Mother was criminally charged with aggravated assault and endangering the welfare of a child (EWOC). *See id.*

"On June 22, 2018, the Swatara Township police were informed that . . . Child was residing with Mother, in violation of her bail conditions, which prohibited her from having contact with any of her children." Orphans' Ct. Op. at 3. The police transferred temporary custody of Child to the Agency. "This was the last time Mother exercised any custody over . . . Child or had any visitation rights with . . . Child, until February 2020, when Mother's bail conditions were removed and she was permitted supervised contact with" Child. *Id.*

Upon Child's removal from Mother's home, the Agency created a family service plan for Mother, which was updated and renewed approximately every six months, with the last one being created in November 2020. *See* Orphans' Ct. Op. at 3-4. With regard to Child, there were limited kinship care resources and as a result, she was placed into formal foster care pending her shelter care hearing. *See* Orphans' Ct. Op. at 3. Following the hearing, the court ordered Child to remain in the Agency's temporary care and custody pending a final hearing. *See id.* During this time, Child was placed in the same foster care home as D.M. *See id.*

In July 2018, following a hearing, Child was adjudicated dependent and placed in the Agency's care and custody. *See* Orphans' Ct. Op. at 4. A kinship resource was identified and approved by the Agency as appropriate placement for Child. *See id.*

Multiple permanency review hearings were held between September 2018 and December 2020. *See* Orphans' Ct. Op. at 4-6. Notably, at the second hearing in December 2018, a finding of abuse was made regarding Mother's conduct towards D.M. *See id.* at 4. At the third hearing in March 2019, the juvenile court found aggravated circumstances existed against Mother because of physical abuse resulting in serious bodily injury to D.M. *See id.* at 5. "Despite this finding, the Agency was ordered by the Court to continue to work toward reunification between . . . Child and Mother." *Id.* At the sixth hearing in March 2020, the "Agency was relieved of reasonable efforts to reunify [Child] with Mother, based on the aggravated circumstances found by [the juvenile court] at the third permanency reviewing hearing concerning Mother's abusive conduct towards D.M." *Id.* at 6. At the seventh hearing in June 2020, the "court found that Mother was minimally compliant with her court ordered service objectives and that Father had no compliance." *Id.* Lastly, at the eighth hearing in December 2020, the court ordered the following: (1) Child to remain dependent and in the Agency's care and custody; (2) that visitation between Mother and Child remain supervised; and (3) that the Agency between relieved of family/kinship finding. *Id.* The court

also found that Mother "was in moderate compliance with her service objectives[,]" but denied her "request for visitation with . . . Child more frequently than every other week." *Id.* at 6-7.

During this time, Mother's bail restrictions were removed, and she was permitted to have bi-weekly visitations[2] with Child. *See* Orphans' Ct. Op. at 5-6. Mother also pled guilty to felony aggravated assault and misdemeanor EWOC on February 19, 2020. *See id.* at 6. That same day, she was sentenced to two years' probation and five years' intermediate punishment supervision (IPP).[3] *See id.*

As for Child, in August 2020, she was moved from a kinship home to a non-kinship foster home with T.B. and B.B., where she resided at the time of the termination hearing.[4] *See* Orphans' Ct. Op. at 6.

On April 8, 2021, the Agency filed a petition for involuntary termination of parent rights (TPR) of both Mother and Father. *See* Orphans' Ct. Op. at 7. At the same time, a goal change to adoption was requested through the

_____

[2] Visitations were described as lasting "about two hours every other week in a highly structured and heavily monitored environment. Mother attended the visitations consistently." *See* Orphans' Ct. Op. at 10 (record citations omitted).

[3] The sentences were to run concurrently.

[4] It was noted at the hearing that Child referred to her foster parents as "mom" and "dad." Orphans' Ct. Op. at 11.

juvenile court. *See id.* A hearing on the TPR and goal change was held before the orphans' court on June 24, 2021. *See id.*

At the hearing, Tiffany Burston, an agency casework supervisor, testified. *See* Orphans' Ct. Op. at 7. She noted that the "primary objective for Mother had been for her to focus on and improve her mental health[,]" but Mother had been "unable to fully follow" through with the recommendations given to her by numerous providers. *Id.* (record citations omitted). Burston testified that "Mother's mental health instability [was] a health risk" to Child, pointing out that Mother had admitted to the supervisor that she had not been taking her medication due to a mental breakdown, which required inpatient care. *Id.* at 7-8 (record citations omitted). Burston also stated she had concerns about "the possibility of future abuse" to Child, which "was based upon the fact that Mother had been criminally convicted of severe child abuse against her son D.M., who had special needs and was particularly reliant upon Mother for parental care." *Id.* at 8 (record citation omitted). The supervisor further testified that Mother "had never fully acknowledged the harm she caused to D.M. maintaining that she just over-disciplined her son." *Id.* (record citation omitted).

Burston mentioned Mother underwent a mental health evaluation by Hempfield Behavioral Health, and the "evaluation reflected Mother as scoring at high risk on four of five parenting areas." *See* Orphans' Ct. Op. at 8 (record citation omitted). Burston said that Mother was discharged from several

programs over the years for non-compliance or non-attendance. ***See id.*** at 9-10. For example, Mother was referred to Pressley Ridge's Reunification program, an evidence-based program, after her bail conditions were lifted. ***See id.*** at 9. The program was a "component of which was for Mother to commence supervised visitations with" Child. ***Id.*** (record citation omitted). However, Pressley Ridge "terminated the program due to Mother's non-compliance before it had the opportunity to be satisfied that the interactions with . . . Child were progressing." ***Id.*** at 9-10 (record citation omitted). Nevertheless, Mother did complete all the classes offered by Samara Parenting, an approved parenting program that was not evidence-based. ***See id.*** at 10.

Moreover, Burston testified that "the Agency has had a difficult time trying to get Mother to focus on the actual objectives of parenting as opposed to getting involved in different programs that did not relate to reunification[.]" Orphans' Ct. Op. at 9. Burston averred that Child had a bond with Mother "but that it is not a healthy bond." ***Id.*** at 11 (record citation omitted). Per Burston's opinion, it was in Child's best interest for Mother's parental rights be terminated. ***See id.***

Barry Stewart, a family therapist at Pressley Ridge, also testified at the termination proceeding. Stewart stated that he "closed" Mother's case in September 2020 because she was not making any progress and she was not too close to reunification. ***See*** Orphans' Ct. Op. at 11 (record citation

omitted). "He felt that Mother was not focused during their meetings and was not retaining what he was trying to teach. He believed her lack of progress was due either to her being bored or having intellectual limitations." *Id.* (record citation omitted). Stewart also stated that "Mother failed to take her prescribed medication which he understood as partly related to her religious beliefs." *Id.* at 12 (record citation omitted). He noted that Mother "blamed the Agency for failing her and was the reason she was in a situation where she was not seeing" Child. *Id.* (record citation omitted). Stewart mentioned Mother "downplayed" her treatment of D.M., "failing to take responsibility for her actions and blaming other people or institutions." *Id.* (record citation omitted). The therapist stated Mother failed to meet several treatment plan goals, including "that she establish and maintain mental health stability, maintain a financially stable home[,] and maintain employment."[5] *Id.* (record citation omitted). Stewart opined that Mother had an "enmeshed" relationship with Child that was "unhealthy." *Id.* (record citation omitted).

Child's therapist, Jennifer Mansfield, testified that Child "talk[ed] about when she used to live with Mother but that the subject is very difficult for her to speak about." *See* Orphans' Ct. Op. at 13 (record citation omitted). Most of the information that Child told Mansfield did not relate to witnessing or

---

[5] Stewart acknowledged that Mother lived in the same residence the entire time he had contact with her and she was not subject to eviction. *See* Orphans' Ct. Op. at 12.

experiencing abuse, but rather about "being left alone and being removed from Mother's house." *Id.* Mansfield indicated Child did not want to "speak ill of her Mother and trie[d] to focus on the positives." *Id.* (record citation omitted). Mansfield expressed concern that Mother's pattern of abuse would continue if Mother and Child were reunited, and that it was her general impression that Child did "not want to be without her mother but she [did] not want to live in that environment." *Id.* at 13 (record citation omitted). Like Stewart, Mansfield did not believe Mother had a "healthy bond" with Child. *Id.* Mansfield averred that terminating Mother's parental rights would not harm Child and she did not have any apprehension as to Child living with the foster parents in their home. *See id.* at 14 (record citation omitted).

Mother also testified at the hearing. She expressed her love for Child, their "good bond[,]" and that it would be detrimental to Child to terminate Mother's parental rights. Orphans' Ct. Op. at 17 (record citation omitted). Mother stated she was "a good parent who made a mistake and [was] seeking a second chance." *Id.* (record citation omitted). "Mother agreed she ha[d] struggled with mental health issues over the past four years, but disagreed it was a lifelong issue." *Id.* (record citation omitted). "She considered herself mentally stable as of the hearing date." *Id.* at 18 (record citation omitted). She placed much of the blame regarding her noncompliance with certain programs on the administrators. *Id.* at 17-18. Lastly, Mother acknowledged that at the time of hearing, she was unemployed and received unemployment

benefits, but planned to seek work as a health aid once her unemployment ran out. *Id.* at 18.

Mother also called two witnesses to testify. April Downing, a family reunification counselor with The Program, and Marissa Wiehe, a therapist with Youth Advocate Program. *See* Orphans' Ct. Op. at 15. Downing "believed that Mother was able to internalize the lessons [from a reunification/parenting class she attended from December 2020 to April 2021,] and showed progress over the course of the class." *Id.* (record citation omitted). Nevertheless, Downing acknowledged that "Child never attended any supervised visits with Mother" during her time with The Program and that observation of Mother and Child would have provided Downing "with a better idea of Mother's parenting skills." *Id.* at 16 (record citations omitted). Wiehe testified that she held outpatient talk therapy sessions with Mother that began in March 2021. *See id.* Wiehe "believed Mother had 'progressed some' during therapy[,]" but that Mother "probably needs a more intensive therapy than talk therapy but that there were limits with telehealth." *Id.* (record citation omitted).

Lastly, "Child's attorney, on cross[-]examination of Mother, indicated to the Court that . . . Child had informed him that she wanted to live with Mother." Orphans' Ct. Op. at 18 (record citation omitted).

On June 25, 2021, the orphans' court issued its decree, in which it granted the Agency's TPR petition pursuant to 23 Pa.C.S. §§ 2511(a)(1),

(a)(2), (a)(5), (a)(8), and 2511(b).  It set forth its rationale on the record.

**See** N.T., 6/25/21, at 3-6.  This timely appeal followed.[6]

Mother presents the following issues for our review:

1. Whether the trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that enough grounds existed for a termination of [Mother]'s parental rights under Section 2511(a) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)[?]

2. Whether the trial court abused its discretion and committed an error of law in determining it would be in . . . [C]hild's best interest to have parental rights terminated, when it failed to primarily consider . . . [C]hild's developmental, physical[,] and emotional needs and welfare, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S.A. § 2511(b)[?]

Appellant's Brief at 4 (some capitalization omitted).

We apply the following standard of review when considering a TPR decree:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse

---

[6]  A review of the record reveals Mother did not file a Pa.R.A.P. 1925(b) concise statement of error complained of on appeal.  **See** Pa.R.A.P. 1925(a)(2)(i) (in a children's fast track appeal, "[t]he concise statement of errors complained of on appeal shall be filed and served with the notice of appeal.").  Neither this Court nor the orphans' court entered an order directing Mother to file a concise statement.  Thus, we decline to find waiver for failure to comply with Pa.R.A.P. 1925(a)(2)(i).  **See In re K.T.E.L.**, 983 A.2d 745, 747 n.1 (Pa. Super. 2009) (holding that failure to file a concise statement with the notice of appeal will result in a defective notice of appeal that will be disposed of on a case-by-case basis).

of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The Pennsylvania Supreme Court has explicitly acknowledged the "significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). As noted above, Section 2511 of the Adoption Act governs the involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The court terminated Mother's parental rights pursuant to Subsections 2511(a)(1), (2), (5), and (8) in addition to Section 2511(b). We need only agree with the court as to any one subsection of Section 2511(a), as well as

- 11 -

Section 2511(b), to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Subsections 2511(a)(1), (2), (5), and (8) and Section 2511(b) are as follows:

> **(a) General rule.**— The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> >
> > \* \* \*
> >
> > (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
> >
> > \* \* \*
> >
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of

- 12 -

removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**— The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. §§ 2511(a)(1), 2511(a)(1), (2) (5), (8), (b).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned and thorough opinion of the orphans' court, we conclude that there is no merit to the issues Mother has raised on appeal.  The orphans' court properly disposed of the questions presented. ***See*** Orphans' Ct. Op. at 19–27 (concluding the Agency provided clear and convincing evidence that: (1) pursuant to Subsection 2511(a)(1), Mother demonstrated a settled intent to relinquish parental claim to Child where: (a) for over a 32-month period, Mother failed to perform parental duties as she was prohibited from seeing Child for much of that time as result of her own actions and the criminal abuse of D.M., (b) even after Mother was granted limited visitation rights for a period of approximately 15 months, Mother performed some parental duties but she was never close to being approved

- 13 -

for increased custody and overnights with Child due her noncompliance and failure to seriously pursue a reunification program until almost two and one-half years after Child's placement, (c) Mother failed to adequately address her mental health instability by repeatedly failing to comply with treatment programs and recommendations and failing to take her medication as prescribed by her psychiatrist, and (d) Mother had not taken responsibility for her abuse of D.M. and blamed the Agency, other people, and other institutions for her problems; (2) in satisfaction of Subsection 2511(a)(2), Mother's refusal to commit to treatment and counseling regarding her mental health incapacity resulted in her failing to provide essential parental care, thereby depriving Child of safety, security, and subsistence necessary for physical and mental well-being and while Mother subsequently may have made efforts to address the concerns of the Agency and her mental health providers, many of those efforts did not commence until recently and some only after the termination petition was filed; (3) pursuant to Subsections 2511(a)(5) and (a)(8), Child has been removed from parental care for more than 12 months, Mother's mental health conditions that led to removal continue to exist, Mother cannot or will not remedy conditions that led to placement, even with services and assistance concerning mental health and parenting programs, within a reasonable period of time, and termination of parental rights would best serve needs and welfare of Child; and (4) termination of Mother's parental rights would serve best interests of Child under Section 2511(b) where (a) the

evidence demonstrated that even though there was a bond between Mother and Child, credible testimony revealed the bond was not healthy as Child appeared to be protecting her mother and Child expressed that while she wanted to be with Mother, she did not want to live in the environment created by Mother's mental health difficulties and (b) the court would not subordinate Child's best interest and the stability with her foster parents in the hope that Mother could someday overcome her obstacles). Accordingly, we affirm on the basis of the orphans' court's opinion while adding a few additional comments.

First, we emphasize that where a parent has made some progress towards resolving the problems that led to the removal of the child, this Court has previously stated:

> [T]he statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re I.J.*, 972 A.2d 5, 11-12 (Pa. Super. 2009) (citations omitted).

Second, Mother's arguments largely amount to a request for this Court to reweigh the evidence in her favor. *See i.e.*, Appellant's Brief at 12 ("In rendering its decision, the [Orphans'] Court failed to give proper weight to the evidence of Mother's efforts to achieve her . . . objectives."). The Pennsylvania Supreme Court has previously opined:

> We [have] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

Because the orphans' court's credibility determinations are supported by the record, we decline to reweigh the evidence. *See id.*

Finally, it merits mention that both Child's legal counsel and her guardian *ad litem* (GAL) agree with the orphans' court's decision. *See* Letter from Gary L. Rothschild, Esquire (Legal Counsel), to Jennifer Traxler, Esquire, 1/28/22 *and* Letter from Sarah E. Hoffman, Esquire (GAL), to Jennifer Traxler, Esquire, 2/8/22. In sum, we discern no abuse of discretion or legal error by the orphans' court in concluding that Mother failed to perform her parental duties pursuant to 23 Pa.C.S. §§ 2511(a) and (b), and termination of her parental rights was proper.

We direct that a copy of the orphans' court's September 17, 2021, opinion be filed along with this memorandum and attached to any future filings in this case.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/14/2022